A AND S, INC. and LINCOLN SALES & SERVICE, INC., corporations, appellees, v. IOWA STATE HIGHWAY COMMISSION et al., appellants, CEDAR RAPIDS STEEL TRANSPORTATION, INC., intervenor-appellee.

No. 50225.

JULY 24, 1962.

Evan Hultman, Attorney General, of Des Moines; C. J. Lyman, Special Assistant Attorney General for Iowa State Highway Commission, of Ames; and Fisher & Pickens, of Cedar Rapids, for appellants.

David G. Bleakley and Harold D. Vietor, both of Cedar Rapids, for appellees and intervenor-appellee.

SNELL, J.—This is an action for injunctive relief to enjoin Iowa State Highway Commission and its construction contractor from installing a median strip without access breaks in the pavement in front of plaintiffs' property. For convenience defendants will be referred to as the commission.

Plaintiff, A and S, Inc., is the owner of a tract of real

property abutting the north side of U. S. Highway No. 30 in the western part of Cedar Rapids and about one mile west of its junction with Iowa Highway No. 149. Lincoln Sales & Service, Inc., one of the plaintiffs, and Cedar Rapids Steel Transportation, Inc., intervenor joining with plaintiffs, are lessees of parts of the property. The property has a frontage on the north side of the highway of 435.7 feet. Two driveways service the property by opening either directly or indirectly onto Highway 30.

Highway 30 is a controlled-access primary highway. Since November 12, 1959, the area has been a part of the City of Cedar Rapids.

Plaintiff, A and S, Inc., is a landholding company dependent on leasing to operative lessees. Lincoln Sales & Service, Inc., operates a truck stop and truck terminal with a trailer sales outlet and a farm and industrial equipment dealership. It has servicing contracts with several commercial carriers. Cedar Rapids Steel Transportation, Inc., is an interstate common carrier servicing between Chicago to a 100 airline mile radius of Cedar Rapids.

The evidence indicates that the real-estate investment in this property is $85,000 and the equipment and fixtures investment is an additional $127,000. The gross annual business of the three corporations is about $1,800,000. They employ about 78 employees.

U. S. Highway No. 30 from the junction with Iowa Highway No. 149 west past plaintiffs' property has for many years been a two-lane highway. For a number of years plans for the widening and improvement of Highway 30 have been under consideration. Traffic volume studies have been made repeatedly and the anticipated increase in traffic has been calculated.

The highway improvement project was first recommended by the district engineer in the fall of 1957 and, after acceptance by the commission, became a part of its 1958 construction program. Thereafter the plans were revised and "upgraded" several times. Some but not all of the changes were known to plaintiffs. The original plans did not provide for a median strip separating the east from the westbound traffic.

For a nominal consideration the commission obtained agreements controlling and limiting the access to the highway. The

agreements provided for two points of access for plaintiffs, one near the west line of their property and the other some 300 feet east and directly in front of an access of plaintiffs presently used in connection with their business. There is considerable dispute in the evidence about discussions, if any, of median strips and the understanding of the parties as to what constitutes "access." Plaintiffs contend that they understood access to mean direct access to all lanes of traffic. Defendant commission contends that access means access to a lane of traffic.

Plaintiffs contend that they were promised by an employee of the commission that if a median strip was installed plaintiffs would be given breaks at each of their entrances and that their agreement consenting to controlled access was based on such assurances.

From time to time the plans for the proposed improvements were submitted to the United States Bureau of Public Roads. The bureau of public roads ultimately recommended a raised median.

As finally designed the project herein involved consisted of a four-lane paved highway 52 feet in total width, including a cement median strip six inches high and four feet wide to separate eastbound traffic from westbound traffic.

The east boundary line of plaintiffs' property is about 3700 feet west of the intersection of Highways 30 and 149. For the purpose of general description but not with engineering accuracy, the project begins about 540 feet west of the intersection of Highway No. 30 and Highway No. 149 and a little less than a mile east of plaintiffs' property. At that point there is a median break designated as number 2. Six hundred forty-two feet farther west is a median break numbered 3. Seven hundred seventy-six feet farther west at a road intersection is break number 4. Fifteen hundred six feet farther west is break number 5. Break number 6 is 1143 feet west of number 5 at a county road intersection. Plaintiffs' property is on the north side of the highway between breaks numbers 5 and 6. One entrance to plaintiffs' property is 341 feet west of break number 5 and the other entrance is 289 feet farther west. The project plans do not provide for any median breaks at any point in front of plaintiffs' property.

Plaintiffs' property being on the north side of the road, vehicles from the east traveling west could turn into plaintiffs' property at either entrance without difficulty. Vehicles approaching from the west, in order to enter plaintiffs' property, would be required to go beyond to either break number 5 or break number 4 and make a U turn to the left and thus join the flow of traffic going west on the north side of the road to plaintiffs' property. Semitractor-trailer units with the maximum legal length could make left-hand turns at the median breaks but would have difficulty in making U turns without maneuvers that would greatly interfere with traffic.

To obviate the necessity for U turns in the direct line of traffic, defendant commission proposed the construction of what are called in the record "jughandles", "loops" or "ramps" at median breaks 4 and 6. These jughandles serve as the alternative to frontage roads and provide room for a sweeping curve in order to reverse the direction in which a vehicle travels. They are designed to enable both eastbound and westbound traffic to reverse direction at planned median strip openings by using the jughandles. The name "jughandles" was given to the structures because their appearance from above somewhat resembles the handle of a jug or pitcher. If the jughandles are constructed as proposed and no median breaks are provided in front of plaintiffs' property, trucks traveling east would travel 1847 feet beyond the entrance to plaintiffs' property, make a left-hand turn at median break 4, go around the jughandle curve and return to plaintiffs' property from the east.

Vehicles on plaintiffs' premises, in order to proceed east, would travel approximately 513 feet west to the jughandle located at median break number 6 and then, after a sweeping turn, reenter the highway at break number 6, make a left turn, and then proceed eastward on the south side of the highway.

Beginning in 1956 studies and factual surveys of the area, including traffic counts, were made, and by using statistical data compiled and analyzed since 1936, defendant commission and its various departments attempt to forecast into the future what the volume of traffic will be on a given stretch of highway. That part of Highway No. 30 immediately west of the junction with Highway No. 149 carries more traffic for the first 37/100

of a mile than it does past plaintiffs' property. By 1959 the daily traffic volume for that part of the highway immediately west of the intersection with Highway No. 149 had increased to 10,660 vehicles per day and for the next one and one-half mile west on Highway 30 the average daily traffic had risen to 8060 vehicles per day. This represents an increase on the eastern part of 11% per year and for the western part of 8½% per year. Based upon actual count and percentage of increase per year, the commission estimated that the average daily volume of traffic over this section of Highway No. 30 will be 17,800 vehicles per day by the year 1980. This figure takes into account an estimated diversion of vehicles to Interstate Highway No. 80, not yet completed. The highway project has an anticipated useful life of 20 years.

In addition to traffic counts, the commission conducted origin and destination studies and speed checks, and computation of savings in costs in the use of the highway indicating substantial cost savings resulting from construction with a raised median reducing the number of places where traffic can turn.

American Association of State Highway Officials, referred to in engineering circles as AASHO, is composed of representatives of the highway departments of the 50 states. AASHO standards set the highway design criteria for the entire nation and the standards so set are relied upon by the United States Bureau of Public Roads. When the plans for the project in question were submitted to the bureau of public roads in July 1959, the bureau reminded the commission that the AASHO standards for traffic volume of 10,000 per day and over would require a four-foot raised median. To comply with this suggestion the plans were "upgraded" to so provide and construction contracts let.

As the work of the contractor progressed and as it approached a point in front of plaintiffs' property, plaintiffs drove a tractor with an inloader and backhoe immediately in front of the construction forms on the pavement, thus temporarily stopping the work. Immediately thereafter, this action was commenced, and ultimately the construction of the median strip past plaintiffs' property without breaks was enjoined.

The issue in the trial court and here is whether or not the proposed action of the commission in not leaving breaks in the median strip on the highway opposite its juncture with plaintiffs' driveways, under all the facts and circumstances, was arbitrary and unreasonable and therefore beyond the scope of proper exercise of police power of the state.

The trial court held for plaintiffs and permanently enjoined the closing of the opening now existing opposite the west side of plaintiffs' property and enjoined the closing of the opening now existing opposite plaintiffs' east driveway until 30 days after jughandles shall have been constructed and placed in operation.

Plaintiffs refer to a street running north and south abutting their property on the west and directly north of the presently existing break at the west edge of their property. Defendants refer to this as a driveway rather than a street. It actually appears to be a stub or dead-end street extending just past plaintiffs' property. There is mention of its future extension.

Plaintiffs complain bitterly that commission's location of the several median breaks is not sound for either the present or future anticipated use of the highway. Breaks numbered 4 and 6 are at presently-located street or road intersections. Breaks numbered 3 and 5 are not at any platted intersections. The area to the north of break number 5 is farm land, referred to by plaintiffs as a bean field. To the south of break number 5 are an ice-cream stand, a house and a garage. The location of median breaks 3 and 5 is defended by the commission as proper in order to serve anticipated development of the territory and anticipated needs therefor. Plaintiffs claim that there is at this time a greater commercial need and that there would be greater use of the median breaks opposite their property than at the breaks proposed by defendant commission.

Defendant commission argues and offers evidence that if the median breaks as requested by plaintiffs are provided, similar requests from other commercial enterprises along the highway will be entitled to the same consideration with the result that the value of the median strip would be lost and that the median strip with its many openings would resemble a row of "flowerpots". Requests for median breaks have been made by other property owners.

Much of the evidence was devoted to the question of design, use of the highway, future development of the area and safety factors under various designs. Considerable evidence relates to the various steps preceding the final design, the upgrading from time to time, plaintiffs' knowledge or lack thereof as to the plans of the commission, conversations, letters, agreements, disagreements and the different understanding of the parties as to the use of words such as "access" and "commercial access" in the discussions and plans. Plaintiffs also claim that they have been misled by statements and assurances by employees of defendant commission. Detailed discussion of these various disputes in the evidence would serve no useful purpose as we do not consider determination thereof controlling.

It clearly appears that there is no uniformity in the distance between median breaks, and it further appears that the breaks shown on the commission's plans are located to conform to the commission's carefully considered opinion as to future needs rather than current convenience of abutting property owners.

There is also evidence that the breaks are not so located as to serve the convenience or speedy service by the city fire department. The firemen want no median strip at all.

We agree with the trial court that the lack of median breaks in front of plaintiffs' property is a definite disadvantage and will undoubtedly deter some eastbound traffic from turning into plaintiffs' place of business, but we do not agree that the proposals of the commission and the final plans for the development of the highway are so arbitrary and unreasonable as to permit interference by the court.

I. It is not the privilege, duty nor within the proper function of judges or courts to pass upon, approve or disapprove the location, design, plans or specifications of public highways. Jurisdiction and control over the primary highways are vested in and imposed on the state highway commission. Section 306.3, Code of Iowa. The improvement of primary roads under the jurisdiction of the commission is provided for in chapter 313, Code of Iowa. Chapter 306A, Code of Iowa, provides for controlled-access highways. In section 306A.1 the legislature finds, determines and declares the provisions of the chapter necessary

for the immediate preservation of the public peace, health and safety, and for the promotion of the public welfare.

A controlled-access facility is a highway or street designed for through traffic and over, from or to which owners or occupants of abutting land or other persons have no right or easement or only a controlled right or easement of access by reason of the fact that their property abuts upon such controlled-access facility or for any other reason. Section 306A.2, Code of Iowa.

As to primary roads, the highway commission is authorized to plan, designate, establish, regulate, vacate, alter, improve, maintain and provide controlled-access facilities for public use wherever in its opinion traffic conditions, present or future, will justify such special facilities. Section 306A.3, Code of Iowa.

As to primary roads, the highway commission is authorized to so design a controlled-access facility and to so regulate, restrict or prohibit access as to best serve the traffic for which such facility is intended. The commission is authorized to separate controlled-access facilities into separate roadways by the construction of raised curbings or central dividing sections. No person has any right of ingress or egress to, from or across controlled-access facilities to or from abutting lands, except at such designated points at which access may be permitted, upon such terms and conditions as may be specified from time to time. Section 306A.4, Code of Iowa.

The legislature has placed in the commission discretion, authority and power. Courts may interfere only when there is abuse of the power so granted or when there is attempted action beyond the grant of power.

Plaintiffs contend, and the trial court held, that the proposed action of the highway commission in not leaving breaks in the median strip opposite plaintiffs' property was arbitrary and unreasonable and therefore beyond the scope of proper and legal exercise of police power.

The problem is factual. The record is extensive. There is a definite conflict of opinion between the commission and its engineers who are planning ahead for the public and abutting owners and users who are damaged through loss of unrestricted access. It is clear that the plans of the commission are not in the best interest of plaintiffs, but it is also clear that throughout

the entire planning and construction period every facet of the problem was carefully considered. The conclusion of the commission was not hasty. It represents the consensus of the engineers in the various departments of the commission. It followed detailed factual studies from which the future use of the highway was projected. It is not for us to pass upon the wisdom of the conclusion reached by the commission. It is for us to consider only the reasonableness of the conclusion.

II. In this case we have no question of eminent domain nor of the right to compensation for the taking of right to access. The right of access to the highway at two points has been reserved to plaintiffs. Vehicles at plaintiffs' place of business may join the westbound traffic without inconvenience. We do have the question of the police power of the commission to restrict and regulate the manner and place at which vehicles may join eastbound traffic.

■ "* * * it is well settled that the regulation of highway traffic comes under the police power. Such regulations have included the prohibition of left and U-turns, the prescribing of one-way traffic and the separation of traffic lanes. Moreover, traffic controls, road design and highway relocation, giving rise to 'circuity of travel' and 'diversion of traffic,' have generally been held to constitute a valid exercise by the state of its police power." 43 Iowa Law Review 264, and citations.

Wegner v. Kelley, 182 Iowa 259, 165 N.W. 449, was an action for damages following a collision with a telephone wire. It was before our present controlled-access statute but shows that the questions of access are not new. It was there held that the right of a property owner to have access to his property from a highway or street may be limited to any extent so long as reasonable and convenient access is preserved to him. Since that case emphasis on the convenience of an abutting property owner has faded away.

Iowa State Highway Commission v. Smith, 248 Iowa 869, 876, 82 N.W.2d 755, 73 A. L. R.2d 680, involved the limitation upon access, left turns and U turns except at designated points. Under the restrictions imposed traffic could enter defendants' place of business only from the east. Traffic from the west could enter only by going beyond to an intersection where turning was

permitted, make a U turn and then travel back to defendants' entrance. The situation was comparable to the case at bar. The cited case holds that the commission has the undoubted right, in the interest of public safety, to regulate the means of access to abutting property provided its regulations are reasonable and strike a balance between the public and private interests.

"In determining whether limitations placed by the commission upon the number and location of access connections are reasonable the judgment of the commission is entitled to deference because of its superior knowledge of highway and traffic matters. But the commission's authority is not above that of the courts."

█ It should be kept in mind that the question for decision by courts is the reasonableness of the regulation and not the court's agreement as to the wisdom or desirability of the commission's decision.

From the discussion involving the restriction of access to all lanes of traffic we quote (pages 879, 880 of 248 Iowa):

"We have no difficulty in disposing of defendants' appeal from the part of the judgment holding the prohibition of crossing the highway, left turns and U turns except at designated points where there are no raised 'jiggle' bars does not constitute a taking of defendants' property within the law of eminent domain. The law on this phase of the controversy seems to be thoroughly settled by many recent decisions and the judgment must be affirmed on defendants' appeal. We shall not discuss the matter at length nor attempt to cite more than a few of the authorities that support our conclusion.

"Such regulations as are imposed here on the movement of traffic are almost universally regarded as reasonable. They facilitate more travel by more motorists in less time. They eliminate left turns and U turns, restrict the number of places where motorists may enter and leave the highway and practically eliminate collisions between vehicles going in opposite directions. Thus they greatly reduce sources of danger.

"Insofar as the regulations may divert some traffic (mainly eastbound) from defendants' filling station they have no legal cause for complaint. They have no vested right to the continuance of existing traffic past their establishment. The requirement that defendants cross the highway only at designated places is

imposed upon all members of the public. Once upon the highway defendants are treated no differently than all other motorists."

Wilson v. Iowa State Highway Commission, 249 Iowa 994, 90 N.W.2d 161, involved property across the street from that involved in the Smith case, supra. As in the Smith case, access was limited. A jury verdict was set aside and a new trial ordered because it appeared the jury considered circuity of travel as an element of damage. The Smith opinion was quoted with approval and suggested as an aid on retrial of the case.

Death to the idea that inconvenience to a property owner could restrict the plans of the highway commission followed the case of Warren v. Iowa State Highway Commission, 250 Iowa 473, 93 N.W.2d 60. In that case the highway commission, acting under the authority of chapter 306A of the Code, closed a secondary road at an intersection with an interstate highway. The plaintiff owned two tracts of land about one-quarter mile apart by way of the secondary road. The secondary road had for many years been used as a convenient means of travel between the two tracts. Cattle had been driven back and forth and farm machinery had been moved regularly over this road. With the closing of the secondary road at the intersection of the interstate highway, plaintiff was deprived of the convenient means of access and travel between the two tracts of land and thereafter was compelled to substitute for the direct one-quarter-mile road a route of over three miles with two crossings of a main line railroad and considerable travel over the federal highway. The great inconvenience to plaintiff incident to the change was obvious. The applicable law was thoroughly discussed and authorities cited, and repetition here is not necessary. We will mention only a few of the comments.

■■■ Public highways are created by statute, either directly or through power delegated to some subdivision of the state. They may be discontinued in the same way, and no individual can acquire such vested rights as will prevent discontinuance.

Chapter 306A of the Code relating to controlled-access highways is a declaration by the state of intention to proceed through its police powers. The legislature gave to the com-

mission the power to close intersections under the state's police power. In commenting upon the inconvenience following the closing of an intersection, the opinion states at page 480 of 250 Iowa: "Farmers, such as the plaintiff, will find they cannot reach their neighbors or shopping centers or, perhaps, other tracts of their own lands, without much additional travel. Businessmen on city streets may find customers unable to reach their establishments from one direction. Workingmen will be compelled to travel farther to reach their places of employment." The Smith case, supra, was cited and quoted with approval. If access to the highway is afforded, circuity of travel to a desired destination is not a controlling element.

"This is a common injury, inevitable in the building of highways, or in handling the traffic upon them. Many owners of motels, or gasoline stations, or other business establishments find themselves left in a by-water of commerce when the route of a highway is changed so that the main flow of traffic is diverted. A merchant or other businessman is cut off from prospective customers going in one direction when a street in front of his establishment is converted into a one-way thoroughfare. A divided highway, or one with 'jiggle' bars or other obstructions in the center to prevent traffic crossing, has the same effect. But this gives the businessman no claim for damages against the authority which has installed the traffic regulators which injure him. Iowa State Highway Commission v. Smith, supra; Wilson v. Iowa State Highway Commission, 249 Iowa 994, 1004–1006, 90 N.W.2d 161, 168.

"* * * The greatest good of the greatest number is the criterion which the authorities having charge of the building, alteration, and maintenance of the highway systems in the State must follow. In the absence of any showing of fraud or bad faith their judgment is final. It cannot be reviewed by the courts. Chrisman v. Brandes, supra, page 441 of 137 Iowa, page 836 of 112 N.W.; Spitzer v. Runyan, 113 Iowa 619, 622, 85 N.W. 782, 783, and citations. If it were not so, no highway system would be possible." (Pages 485, 486 of 250 Iowa)

III. While the authority of the highway commission is great, it may not proceed illegally nor in derogation of its statutory authority. Batcheller v. Iowa State Highway Commission,

251 Iowa 364, 101 N.W.2d 30. See also Porter v. Iowa State Highway Commission, 241 Iowa 1208, 44 N.W.2d 682. The general authority of the commission to design the pavement and provide for median strips and breaks therein is not questioned. We may interfere only if the refusal of the commission to provide breaks in front of plaintiffs' property is so arbitrary and unreasonable as to be beyond the police power of the state.

There is no all-embracing test of reasonableness. Human judgment is involved. 11 Am. Jur., Constitutional Law, section 304. A footnote to 11 Am. Jur., Constitutional Law, section 303, in 1962 Cumulative Supplement, page 159, says: "A regulation which ostensibly seeks the protection of the public safety but which factually runs counter to the common experience of mankind is unreasonable."

Do the plans of the commission run counter to the common experience of mankind so as to be unreasonable? We cannot so hold. To do so would ignore the studies, experience and opinions of the experts in the field of highway engineering. In opposition to the testimony of the experts, we have the officers of the plaintiff corporations, the traffic captain of the Cedar Rapids Police Department, who has had no experience with median strips in the city and who does not consider the area "particularly dangerous", the chief of the fire department, who wants no median strips at all because of their hindrance in getting to a fire, and the city commissioner of public safety. The commissioner believes "in median strips if they don't have breaks." He sees no extraordinary hazard in leaving the breaks in front of plaintiffs' property as long as there are other breaks in the median strip. This evidence, even aided by our own appreciation of plaintiffs' dilemma, will not support a judicial decree that the conclusion of the commission, based on years of study and experience, runs so counter to the experience of mankind as to be unreasonable.

We cannot substitute what we might think most desirable in the way of pavement design for the thinking of experts in that field. To do so would disregard the purpose for which engineers and statistical analysts are employed. Neither can we close our eyes to the declaration of public policy by the legislature.

IV. Where discretion is vested in a particular agency the courts cannot control that discretion nor pass upon the propriety of its exercise in the absence of some showing of bad faith. Mathiasen v. State Conservation Commission, 246 Iowa 905, 70 N.W.2d 158.

Plaintiffs accuse the commission of bad faith. The evidence does not support the accusation. Plaintiffs were not kept advised of the various steps in the planning. The plans were "upgraded" without notice to plaintiffs. Before the plans provided for a median strip, an employee or employees of the commission said, or at least led plaintiffs to believe, that no median strip was contemplated. Plaintiffs also claim they were led to believe that if a median should be built breaks would be provided. There is no showing that such statements as may have been made were not true when made. There is no showing of any intentional misleading by anyone. There is no showing of any authority of employees to bind the commission as to future plans and no showing of any duty on the part of the commission to keep plaintiffs advised of change in plans.

At the trial defendants agreed that the median break opposite plaintiffs' west entrance would not be closed until the construction of the three "jughandles" described in the evidence is completed. We approve this temporary restriction. Subject only thereto, the case is reversed and the injunction by the district court is dissolved.—Reversed.

GARFIELD, C. J., and OLIVER, HAYS, THOMPSON, PETERSON, THORNTON and MOORE, JJ., concur.