George Schmitt, appellee, v. John L. Kirkpatrick, appellant.

No. 48420.

(Reported in 63 N.W.2d 228)

 

MARCH 9, 1954.

REHEARING DENIED JUNE 18, 1954.

D. C. Nolan, William M. Tucker and Edward F. Rate, all of Iowa City, for appellant.

Messer, Hamilton & Cahill, of Iowa City, for appellee.

THOMPSON, J.—The plaintiff is and has been at all times material the owner of 80 acres of farm land in Johnson County, lying immediately to the west of and adjoining another 80 acres owned by the defendant. The long axis of each 80 acres runs north and south. There is a road running east and west along the north edge of both tracts and the plaintiff's 80 acres is also bounded on the west by a road running north and south.

A natural ditch, which comes from the north, enters the plaintiff's land at a point approximately 18 rods east of the intersection formed by the above mentioned roads. The ditch crosses the northwest corner of the plaintiff's land and continues in a general westerly direction leaving the plaintiff's land at a point approximately 20 rods south of the above mentioned inter-

section. At the point where the ditch crosses the east-west road, before entering the plaintiff's land there is a bridge approximately 36 feet long, and a bridge approximately 40 feet long spans the ditch at the point where it crosses the north-south road.

The natural flow of surface water is to the west through a swale which begins at a point east of the east line of the defendant's land. This depression descends to the west across the north forties of both the plaintiff and the defendant and empties into the highway ditch on the plaintiff's west line. The water then flows in a northerly direction through the highway ditch and empties into the natural ditch or creek referred to above. The east-west depression is well defined at the point where it enters the road ditch. Most of the water from the east is collected and confined so that it flows through this well-defined spot.

The above watercourse across the north forties of the plaintiff and the defendant is the natural course of drainage for an area of 171 acres. The plaintiff has tiled this watercourse. The main tile, a 12-inch tile, extends from the west to a point 17 rods west of the defendant's land. The defendant's father extended the tile drain by placing 8-inch tile from the east end of the above 12-inch tile and continuing up and across the defendant's land. The plaintiff has several 8-inch and 4-inch lateral tile lines connecting to the above 12-inch tile. Approximately 1700 rods of the plaintiff's own tile runs into the 12-inch tile. In addition; there is the above 8-inch tile, which hooks up with the plaintiff's 12-inch tile, with several lateral tile lines laid on the defendant's land.

The plaintiff's south forty is also rather extensively tiled, this forty being somewhat higher than the north forty, and the highest point on the plaintiff's eighty is about 60 rods south of his buildings.

A small pond on the plaintiff's south forty is located near the east line fence and covers an area of approximately two or three acres. This pond is drained by means of the tile on the plaintiff's south forty. The above tile, although adequate to drain the plaintiff's small pond, would not be adequate to drain the plaintiff's pond and also the defendant's seven-acre pond to which reference is hereinafter made.

There is also a tile drain which runs west from the defendant's seven-acre pond through the plaintiff's pond. The tile then runs in a southwesterly direction onto some other land owned by William Kirkpatrick before it reaches the north-south road ditch on the west of the plaintiff's land. The tile is a 4-inch tile drain and was working in the spring of 1951. Although this 4-inch tile runs west through the plaintiff's pond, it has no connection with the plaintiff's tiling; it is a wholly independent tile drain.

A depressed area or pond is located on the defendant's · south forty. This pond covers an area of from 6.1 to 7.3 acres. The area of the watershed which drains into the seven-acre pond is 42 acres. A natural barrier of higher ground surrounds this area. The lowest point on the bank of the pond is to the west. When the water in the pond reached the level of this low point it would flow to the west toward the plaintiff's property. However, there is only one time that the pond has been known to overflow its banks and that was on the occasion of the heavy rain in June 1950.

This pond serves as a reservoir for the surface water from a drainage area of 42 acres. Whether there is a natural outlet for this pond is not much discussed by the litigants. It depends upon the law as applied to the drainage of these depressions generally. If a depression has adequate natural drainage, of course it is not ordinarily a pond. It is the fact that the depression is enclosed by a rim of higher ground that makes it a pond. There is authority for a holding that the lowest point in the enclosing ground, the spot at which overflow water will first run from the depression, and the course which it will then pursue constitute the natural outlet. Anderson v. Henderson, 124 Ill. 164, 16 N.E. 232, 234, 235; Tennigkeit v. Ferguson, 192 Iowa 841, 185 N.W. 577. This would indicate that the natural outlet and drainage of the pond in question was to the west, since on the only known occasion on which it overflowed the water went in that direction. This would have the effect of casting it almost immediately upon plaintiff's land, since the pond lies very close to defendant's west line. But we need not go further into the question of the natural drainage of the

pond, if any it had, since the case must be decided upon a point which does not involve a determination of the natural outlet.

In addition to the seven-acre pond, there was a second and smaller depression on defendant's north forty, lying north of the swale, having an area of about two acres. The refusal of the trial court to enjoin maintenance of a ditch from this pond to the swale was the subject of plaintiff's cross-appeal; but plaintiff has not argued his appeal, and it must be considered to be abandoned. Yetley v. Irons, 238 Iowa 23, 24, 25 N.W.2d 677, 68 A. L. R. 1159, and Deaton v. Hollingshead, 225 Iowa 967, 975, 282 N.W. 329, 334. Our discussion will pertain entirely to the seven-acre pond.

Following the occasion of the heavy rain of June 1950, the defendant conceived the idea of draining the ponds. With this purpose in mind he consulted the United States Soil Conservation Service with offices located in Iowa City, Iowa. Following this consultation a survey was made to explore the possibilities of drainage. Two possible drainage routes were suggested: (1) to go west out of the low side of the pond, and (2) to go northeast and then north through another low spot. Men from the Soil Conservation Office selected and staked out the route to the north.

In November 1950 the ditch was started. Shortly after the commencement of the ditch the plaintiff objected to it. The defendant sought legal advice and thereafter proceeded with the construction of the ditch and completed it.

The ditch as constructed cut through the natural barrier surrounding the pond at a point in the north bank. The ditch runs northeasterly to northerly for 250 feet and the total length of the ditch from the low spot in the pond to its northernmost extremity is 700 feet. After the ditch runs out some 250 feet it widens out and becomes so shallow there is practically no ditch.

The ditch as constructed was 4.8 feet at the deepest point and was constructed in such a way that it could be farmed over after completion. After the construction of the ditch, the water would flow out of the pond area north through the ditch to the east-west drainageway and then flow west onto the plaintiff's land down to the road ditch and north into the natural ditch

at the bridge. The distance from the pond to the swale is roughly 700 feet, and the point in the swale at which the ditch enters is about 800 to 900 feet east of plaintiff's land. But it has been pointed out that for practical purposes the ditch terminates about 250 feet from the pond. As plaintiff puts it at one point in his brief, it there "feathers out" so there is practically no ditch. The effect of this is to permit the water drained from the pond area to spread out upon defendant's land and normally much of it would seep into the ground before reaching the swale. The swale also is quite shallow. Both the ditch and the swale are farmed across and through.

While the pond area of approximately seven acres was farmed and raised good crops in years of moderate rainfall, heavy rains would cause water to stand there for some time, before the construction of the ditch. There was no means for the water to escape until it reached the height of the lowest point of the rim, on the west; and of course it was only the excess above rim-full which was drained away. Otherwise such waters as might be trapped there were removed only by seepage and evaporation, and by the apparently inadequate 4-inch tile drain; and in years of heavy rainfall this condition prevented the raising of crops, or at least of good crops, in the pond area.

Water running through the swale across defendant's land and upon plaintiff's ordinarily moves so that it did not stand upon the latter's ground more than a few hours. It crossed the swale and flowed into the roadside ditch on the west side of plaintiff's farm; then through the ditch north a short distance to the creek which crossed the northwest corner of plaintiff's north forty acres. In June of 1950, when a very heavy rain measuring several inches fell, this creek was unable to carry all the water, and so the water from the roadside ditch and from the swale backed up on plaintiff's land, and remained there for some time. It is plaintiff's contention that under such conditions the additional water from the pond area on defendant's land is so much additional burden which he is not required to bear.

I. The trial court found that the defendant, by cutting the natural barrier on the north side of the pond, diverted the waters from that area into an unnatural channel, that such waters

were thereby caused to flow upon plaintiff's lands in a greatly increased or unnatural quantity, and that substantial damage was or would be caused thereby. Defendant upon this appeal states two propositions relied upon for reversal, only the second of which we find it necessary to discuss. It is this: "The court erred in granting an injunction since there was no evidence that plaintiff had or would sustain any substantial damage as the result of the construction of the ditch by defendant."

It is elementary that a court of equity will not resort to the granting of injunctive relief unless it appears there is an invasion or threatened invasion of a right, and that substantial injury will result to the party whose rights are so invaded, or such injury is reasonably to be apprehended. It is equally well settled that the burden is upon him who asks this relief to prove these elements of his case. We have announced and followed these rules in many drainage cases.

In the very recent case of Cundiff v. Kopseiker, 245 Iowa 179, 185, 61 N.W.2d 443, 446, where the controversy revolved around the drainage of a tract of 4.30 acres, we said: "There is no definite evidence of the amount of additional water which flowed onto plaintiffs' land by reason of the claimed drainage of the small area heretofore mentioned. The burden of proof was on the plaintiffs to show the defendants caused an additional flow of water *and the resulting damage*." (Italics added.) The rule is well stated in Droegmiller v. Olson, 241 Iowa 456, 467, 40 N.W.2d 292, 299, thus: "While we have not always been careful to observe the rule, where a private owner seeks to enjoin the diversion of surface water he must show substantial injury * * * or definite assurance thereof." To the same effect are Board of Supervisors of Pottawattamie County v. Board of Supervisors of Harrison County, 214 Iowa 655, 672, 241 N.W. 14, 22 ("* * * the rule under the statute now is that the upper proprietor may drain his land through natural watercourses in a way to increase the water that is to flow over the servient land, providing the increase is not too great or in such unnatural quantities 'as to be the cause of substantial injury.' "), and Obe v. Pattat, 151 Iowa 723, 130 N.W. 903. Many other cases might be cited.

In Tennigkeit v. Ferguson, supra, plaintiff owned 80 acres of land lying immediately west of an 80-acre tract belonging to defendants, and the natural drainage was from east to west. There was a pond of unspecified size on defendants' land, in which water collected; was in fact gathered to some extent by tile ditches draining into it from the east. At times there was little or no water in the pond. When the rainfall was heavy the pond overflowed, the water going west through gullies or natural ditches which it cut in so doing, to and upon plaintiff's land. The defendant cut through the rim of the ditch and sent the water through ditches constructed along the line of these gullies so that it was cast upon plaintiff. More water thereby reached plaintiff's land than before; but the court found he was entitled to no relief. In the instant case, the natural drainage of the pond when it overflowed was to the west also. Instead of cutting through the west rim, however, the defendant, following the advice of the United States Soil Conservation Service, went to the north. If he had constructed his ditch to the west, he would have been within the factual situation of the Tennigkeit case so far as construction was concerned, and the water would have been cast upon plaintiff's land almost immediately, and before it had any opportunity to spread out and seep into the soil on defendant's land or to evaporate in the course of its progress before reaching plaintiff.

II. However, conceding, arguendo at least, that plaintiff had the technical right to have the water come upon his land through a natural outlet or drainage channel, he is not relieved from the necessity of showing not only a material increase in the volume of water coming through an unnatural way, but that he has been or will be substantially injured thereby. It is in this latter requirement we think he has failed.

The record shows the pond area itself approximates seven acres and it drains a total area of 42 acres. The total area drained by the swale into which the pond area is drained by the ditch running north from the pond was 171 acres; with the additional area draining into it from the pond it is now 213 acres, an increase of 24.7%. The important inquiry is whether there is anything to show this additional drainage will

reach plaintiff's land in a quantity sufficient to do material harm.

The record shows the pond itself will hold, when full, something more than 4,000,000 gallons of water. It has never been entirely full, at least to the point of overflowing, except in June of 1950. Testimony of witnesses is, however, that it has been nearly full on other occasions. But we must remember that this may have been the accumulation of several rains. It does not mean that there have been many occasions when one rainfall was sufficient to cast 4,000,000 gallons of water on the pond area at one time. We have no guide as to how often there have been hard rains sufficient at any one time to precipitate that large a quantity of water, or an approach thereto, upon this area. With the ditch operating, each rainfall will be taken care of as it comes down. It is not a case where a confined body of water is to be released suddenly and en masse.

It is conceded no harm had come to plaintiff's land from the drainage of the pond during the years 1951 and 1952, as to which experience was available between the time of construction of the ditch and the trial below. This, however, is said to have been because there were no heavy rains during those years, although there was ample moisture to raise good to exceptionally good crops. Conceding that in some years more moisture falls and sometimes in more concentrated quantities than in others, the plaintiff is still compelled to show, if he can, a reasonable prospect of injury in the future. This his counsel attempt to do by showing the percentage of additional area—24.7—to be drained upon his land by the ditch; the number of gallons of water the pond would hold when full; and by arguing therefrom, that there is danger of erosion on plaintiff's land, and of clogging his tile drains, and of increasing the volume of water which will stand upon his farm after a heavy rain or rains. Plaintiff cites and relies heavily upon Kaufman v. Lenker, 164 Iowa 689, 146 N.W. 823. There, as here, the defendant had cut through a ridge surrounding a pond and drained the water in such a way as to cast it eventually upon plaintiff's land. But the broad distinction between the cases is that in the Kaufman case there was a clear showing of injury to plaintiff. It appeared large

bodies of water had been cast upon plaintiff's land which had never before reached it, and a ditch, five feet wide at the outlet from defendant's land and increasing to 16 feet from edge to edge, in places several inches deep, and running for 500 feet, had been cut across plaintiff's farm. Substantial damage here was not a subject for speculation; it already appeared.

We are left to determine whether, granting there will be some additional water cast on plaintiff, we can say there is a reasonable prospect of injury. We have no way of knowing, except for one experience in forty-six years, how much water will flow from the pond area at any one time; nor how much of what does flow from there will reach plaintiff's land. It will certainly spread out over defendant's land for some hundreds of feet before reaching the swale; and the swale itself is wide and shallow. There will in ordinary times be some seepage along this route, and some evaporation. An uncertain amount presumably will be carried away promptly by the tile drain running through the pond to the west. We have pointed out that both the swale, the pond area, and now, the ditch, are tillable. The pond, a term which, in this case, does not imply constant standing water, was usually farmed.

So far as the record shows, the only time water coming from the swale has stood for any appreciable time upon plaintiff's land is when the creek, which is the eventual outlet for some 2000 acres of drainage, including the swale, is unable to carry the volume in times of heavy rains. It then backs up the water in the road ditch and the water from the swale, being unable to enter the ditch, stands on several acres of plaintiff's farm. It is true that, if the volume coming through the swale at such times is increased, there will be more standing water. But the chief difficulty here is the inadequacy of the creek. While the pond area of 42 acres is 24.7% of the swale drainage area, it is only approximately 2% of the creek drainage territory; and it is with the insufficiency of the creek at exceptional times the major trouble lies.

Perhaps a competent drainage engineer could have made an estimate of the prospective damage, if any, to plaintiff's farm. We are given no such guide. The engineers and authorities of

the United States Soil Conservation Service advised the construction of the ditch as it is. There is no evidence from them or from other engineers who testified in the case showing any reasonable probability of damage. The plaintiff himself thought his tile through the swale on his land insufficient to carry additional water. This is the only evidence, opinion or otherwise, which shows any prospective damage to him, and we consider it inadequate to be deemed any real showing of injury.

We are not permitted to speculate as to how much additional water will actually reach plaintiff's land because of the construction of the controversial ditch; nor what erosion may take place or if plaintiff's tile line will be blocked. We have said repeatedly that the owner of the dominant estate may cast an additional quantity of water upon the servient one, if he does not thereby do substantial damage. Tennigkeit v. Ferguson and Obe v. Pattat, both supra; Dorr v. Simmerson, 127 Iowa 551, 554, 103 N.W. 806, 807.

The State of Iowa is composed almost altogether of rolling prairie land, and in its original condition was dotted with thousands of small depressions, commonly known as ponds. Some of these held water all or most of the year, under normal weather conditions; others, as the one causing controversy here, only during times of excessive rainfall. It was largely because of the necessity, in the interest of proper development and utilization of the agricultural potentialities of the farm lands of the state, that the original strict limitation of the right of the dominant owner to drain his land upon the servient estate was modified. Board of Supervisors of Pottawattamie County v. Board of Supervisors of Harrison County, supra, page 669 of 214 Iowa, page 20 of 241 N.W.; Dorr v. Simmerson, supra, page 554 of 127 Iowa, page 807 of 103 N.W. The emphasis is now placed upon the injury or potential injury rather than upon additional water cast upon the servient lands. The record does not show plaintiff has carried the burden of showing such injury or reasonable probability of injury. Defendant is entitled to decree below in conformity with this opinion.

III. Plaintiff has filed a motion to dismiss defendant's appeal, alleging failure to comply with various provisions of

982

the Rules of Civil Procedure. We find insufficient support for this motion in the record, and it is denied.

Plaintiff's appeal is dismissed and plaintiff's motion to dismiss defendant's appeal is denied. Reversed on defendant's appeal.

All JUSTICES concur.