ROSENDAHL LEVY and/or Drainage District, Robert Houlihan, as Trustee, and Carroll M. and Margaret E. White, Appellees,

v.

IOWA STATE HIGHWAY COMMISSION, Appellant.

No. 53341.

Supreme Court of Iowa.

Oct. 14, 1969.

Richard C. Turner, Atty. Gen., Robert Merillat, Sp. Asst. Atty. Gen., James Graham, Asst. Atty. Gen., and Jacobson, Bristol & Thomson, Waukon, for appellant.

Strand & Kiener, Decorah, for appellees.

LeGRAND, Justice.

This is an action in equity for a mandatory injunction against the Iowa State Highway Commission. Plaintiffs allege defendant constructed U. S. Highway #52 by-pass near Decorah in a manner which caused surface water to drain over their land in excessive quantities and with accelerated velocity, causing severe and repeated damage. Plaintiffs claim, too, that such damage will recur unless the relief they seek is granted. The trial court found plaintiffs were entitled to an injunction and the highway commission appeals. We affirm.

Plaintiffs Rosendahl Levy and/or Drainage District and Robert Houlihan, Trustee of the drainage district, bring this action on behalf of individual owners of real estate within the district. Plaintiffs Carroll M. White and Margaret E. White own real estate in the district.

For some years Lawrence W. Rosendahl owned 26 acres of relatively level land lying at the base of a steep bluff in Winneshiek County. In 1959 he built 13 or 14 homes on this property, which he subsequently sold to various persons. The bluff lies to the west of these homes. It is described as densely wooded and heavily overgrown with grass and other vegetation.

This property lies in the flood plain of the Upper Iowa River, which caused serious flood damage in 1961. Principally because of this flood and in the hope of avoiding future similar experiences, the Rosendahl Levy and/or Drainage District was formed in 1962 under chapter 455, Iowa Code, 1958.

Subsequent to the formation of the drainage district the members thereof built a dike road, installed flood gates, and made their property as secure from river damage as reasonably possible. They claim—with considerable support in the record—there was then no reason to apprehend danger of excessive drainage or run-off from the hill to the west of their property. There had never been such a problem.

In 1962 work on U. S. Highway 52 by-pass was started. A right-of-way was obtained from Rosendahl, who had retained ownership of the bluff, and the road was cut out of the side of the hill. In connection with this construction changes were made in the contour of the hill, which had a rock base with a substantial covering of top soil.

The evidence shows practically all the topsoil was removed and the hill was taken down to its rock base. It is undisputed that topsoil and vegetation are essential to percolation, a process by which surface water sinks in, and is absorbed by, the soil. Elimination of this covering necessarily quickened the rate of water run-off from the highway site.

The record also shows the original peak of the hill was moved to a point some 300 to 400 feet away. Pipes, flumes and culverts were installed to collect and discharge surface water at selected spots in greater quantity and with greater force than before. There was evidence much of this run-off came at places which were not in the natural watercourse before the changes were made.

Soon after construction work started, drainage conditions changed dramatically. Where there had been no run-off problems, there was now almost constant difficulty. Water accumulated or ponded in the yards of the property owners. Silt, sand, dirt and debris washed down in great quantities. One witness testified he was required to repair his driveway three times because of water damage after the road work started. Another said that, where there had been only slight water drainage earlier, water now ran knee-deep on the hillside during a heavy rain.

On several occasions water ran so swift and deep there was difficulty getting in and out of driveways. At times silt and debris piled up to a depth of 28 inches. One witness said there was a "regular cascade of water and muck when it rained." Lawns, shrubbery, and plantings suffered frequent damage.

After the highway was completed, according to one witness, "water came down the hill like a waterfall—18 inches to two feet wide." This same witness stated her yard became virtually unusable because of repeated damage from run-off water.

In some instances the sand, silt and debris deposit was spread over a 100-foot radius. There was testimony that water came rushing down the ravine and "rocks of every size were coming down." Several witnesses said the natural run-off was clear before the road work, but afterward it was a gray, muddy, clayish looking color, thick with sediment and debris, and that it left a residue of this substance over the entire yard, sometimes to a depth of 14 to 16 inches.

Another witness testified that on one occasion after the highway was built, she heard a loud roar and looked out to see water, stones and mud coming down the hill very rapidly.

Frequently those living in the drainage district were required to remove trash and debris from their yards after a rain, as well as to spread out the accumulated silt so grass, bushes and shrubbery would not be permanently damaged. A cleanup of branches, logs, beer cans and other foreign material became routine after any storm.

The evidence shows construction work started with clearing, grubbing and grading, which was completed in 1963. Seeding had been planned for 1963 but was postponed because other related work was still in progress. The paving contractor began work early in the spring of 1964, and paving was finished late that summer. During that year the shoulders and ditches remained in what is called a raw state without grass or vegetation of any kind.

Although the commission disputes the amount of silt and other deposits upon plaintiffs' land, it does not deny some such damage did occur. The disagreement goes only to its extent. One of defendant's witnesses described the situation after one rain as "a mess." Another admitted the

roadwork "aggravated an existing problem." A third testified he "couldn't explain" the differences in drainage before and after the construction of the road as testified to by plaintiffs' witnesses.

These are the facts upon which plaintiffs base their prayer for injunctive relief. Defendant raises two principal propositions for reversal: first, it is immune from suit as an agency of the state in the absence of fraud, illegality or a showing it acted in derogation of its statutory authority; second, plaintiffs have failed to show substantial damage to their property. We discuss both propositions together.

Defendant's claim of immunity depends on several of our prior decisions, including Porter v. Iowa State Highway Commission, 241 Iowa 1208, 1217, 44 N.W.2d 682, 687; Rhodes v. Iowa State Highway Commission, 250 Iowa 416, 419, 94 N.W.2d 97, 99; and A and S, Inc. v. Iowa State Highway Commission, 253 Iowa 1377, 1384, 116 N.W.2d 496, 503. These cases all hold the commission's powers in planning, building, and maintaining highways are broad and plenary; that the commission is an arm of the state; and that courts should not interfere with its activities unless the commission acts in derogation of its statutory authority or unless fraud or illegality is shown.

■ Even if its plea of immunity fails, however, defendant contends plaintiffs have failed to establish their right to injunctive relief. As we discuss later, a court of equity grants an injunction only when a plaintiff proves, in addition to a violation of his rights, that substantial damage will probably otherwise result.

Defendant importunes us to find a failure of proof because whatever damage plaintiffs sustained resulted, not from defendant's conduct, but from an act of God —a five-inch rainfall which caused all of plaintiffs' trouble, and for which defendant should not be held responsible.

This occurred before erosion control had been established and, according to defend-

534

ant, there is now no danger of injury to plaintiffs' land.

Defendant attempted erosion control by standard methods. This consisted of seeding, fertilizing and sodding. Some areas were not subject to such control because they were predominantly rock, but where there was earth-rock mixture vegetation was possible. The work was started in the fall of 1964 and completed in 1965. A double application of seed and one of fertilizer were used. Embankment protection in the form of fiberglass mulch was added. Special seed was used, including types particularly suitable for hillside control. Where necessary ditches were sodded to help slow the run-off. There was undisputed testimony erosion control takes time to develop and improves itself over a period of years.

We mention parenthetically the trial court disregarded the torrential five-inch rain which defendant describes as an act of God in reaching its conclusions. Furthermore defendant's argument on this point would be more persuasive if it were not shown that conditions did not improve after erosion control had been completed in 1965.

Six months after the original trial ended —but before the trial court had made any findings—a motion to reopen for additional testimony was granted. The import of this testimony was that a 1.7-inch rainfall in June of 1967 had caused the same type of damage to plaintiffs as had resulted from earlier storms.

The evidence on reopening also showed erosion control had been successful in the area where the damage was most severe. It showed grass and vegetation growth to be "very good."

One of defendant's witnesses at the reopening hearing described the damage from the June 1967 rain as "a very natural occurrence under the circumstances," from which a conclusion the same situation would result from similar future rains appears justified.

In order to decide for the highway commission on the factual issues involving changes in drainage and the damages resulting therefrom, it would be necessary to disregard almost overwhelming evidence supporting plaintiffs' position. The trial court did not feel it could do so nor do we. Despite defendant's expert testimony that no drainage problem should have arisen from the highway construction, the record conclusively shows one did.

We agree with the finding of the trial court that the construction work carried on by the commission substantially changed the contour of the land, almost completely removed the topsoil, took away all possibility of absorption of drainage water by percolation, and caused water to flow upon plaintiffs' property in substantially greater volume and with increased velocity over a materially altered course. We further agree with the finding that plaintiffs have sustained repeated instances of damage and that they may look forward with reasonable probability to further damage unless the defendant is required to make changes to remedy existing conditions.

■ In reaching this determination we take notice of the vulnerable position in which plaintiffs find themselves because their land lies between the Upper Iowa River to the east and the high bluff to the west. The precautions they took to protect themselves from flood damage now raise an increased danger of run-off water from the west. Should river flooding occur at the same time heavy rains pour off the bluff—a not unlikely prospect—plaintiffs would be imperiled from both directions, because the flood gates could not then be opened to permit surface water to escape. We may properly consider this when determining what relief should be granted. In considering drainage rights we said in Schmitt v. Kirkpatrick, 245 Iowa 971, 981, 63 N.W.2d 228, 233, "We have said repeatedly that the owner of the dominant estate may cast additional quantity of water upon the servient one, *if he does not thereby do substantial damage.*" * * * The em-

phasis is now placed upon the *injury or potential injury* rather than upon additional water cast upon the servient lands." (Emphasis added.)

Defendant argues it was discharging a statutory duty as an agency of the state under chapters 306 and 306A, Code of Iowa; that it proceeded only after suitable and adequate engineering surveys and plans had been prepared; that it was not negligent in following those plans; and that any damage suffered by plaintiffs is without remedy. In other words defendant claims immunity from suit under Porter v. Iowa State Highway Commission, Rhodes v. Iowa State Highway Commission, and A & S, Inc. v. Iowa State Highway Commission, all supra.

The broad power of the defendant commission is no longer debatable, and we do not understand plaintiffs to challenge it. They contend, however, that the actions of the highway commission complained of here were illegal and were in derogation of its statutory authority. They rely upon section 314.7, Code of Iowa, which provides in part, "Officers, employees, and contractors in charge of improvement or maintenance work on any highway [shall not] * * * turn the natural drainage of the surface water to the injury of adjoining owners. It shall be their duty to use strict diligence in draining the surface water from the public road in its natural channel. * * *"

Plaintiffs argue that the manner in which U. S. Highway 52 by-pass was constructed violated this statute. In this connection the case of Hoover v. Iowa State Highway Commission, 207 Iowa 56, 61, 222 N.W. 438, 440, is of interest. That case involved the exercise of condemnation rights and, after acknowledging the broad powers of the commission, we held a court of equity could grant relief when the commission wrongfully exercised its authority. We said:

"Appellant [plaintiff] does not attempt to obtain money from the state, or interfere with its sovereignty, or the administration of its affairs through proper agencies. On the other hand, he only wants to protect his property from destruction by the agents of the state, who exceed their authority and thereby seek to take it from him, not with, but without, legal right and in opposition to a legislative guarantee. * * *

" * * * There is in this instance an illustration of the clear distinction between an attempt to control the action or discretion of the state or its officers, board, or commission in regard to matters entrusted to them on the one hand, and on the other, appellant's humble effort to prevent appellees from violating his constitutional, statutory, and property rights. A strange doctrine, indeed, would give rise to the court's insufficiency to help him at this juncture. * * * Without this judicial redress, appellant would be helpless, and the apparent security of the Constitution and statutes become, so far as he and his property rights are concerned a mere pretense without out practical meaning or effect."

Although the Hoover case involved a different type of action, what was said there supports our holding here. Plaintiffs seek only to protect their land from serious damage or destruction at the hands of the highway commission. We repeat it would "be a strange doctrine" if the courts were unable to grant plaintiffs relief on the spurious ground of immunity if the protested action is in violation of the statutory duty under which the commission purports to act.

We have frequently held the defendant commission's statutory powers are broad and plenary, beyond the control of the courts in the absence of fraud, bad faith, or arbitrary abuse of discretion. See Harvey v. Iowa State Highway Commission, 256 Iowa 1229, 1231, 130 N.W.2d 725, 726, and the many citations there set out. We have also consistently upheld a property owner's right to enjoin the highway commission when the acts of that body are

illegal or in derogation of its statutory authority. Rhodes v. Iowa State Highway Commission, 250 Iowa 416, 419, 94 N.W. 97, 99; Johnson v. Iowa State Highway Commission, 250 Iowa 521, 527, 94 N.W.2d 773, 777; Batcheller v. Iowa State Highway Commission, 251 Iowa 364, 368, 101 N.W.2d 30, 33.

■ We hold the defendant acted here in violation of section 314.7, Code of Iowa, and find plaintiffs are entitled to injunctive relief.

This has always been a fruitful field of litigation and we have several times conceded out cases are not entirely consistent. In Cole v. City of Des Moines, 212 Iowa 1270, 1278, 232 N.W. 800, 804, we said, "There is undoubtedly a hopeless conflict in the authorities throughout the United States on this question, and the rules laid down would appear to be irreconcilable. * * * [I]t must be admitted that our decisions are not all in harmony."

In Woods v. Incorporated Town of State Centre, 249 Iowa 38, 40, 85 N.W.2d 519, 521, we repeated this observation with the added comment that each case depends largely on the particular facts shown.

■ The general rule is that the dominant owner is entitled to drain surface water in a natural watercourse from his land over the servient owner's land and if any damage results the servient owner is without remedy. This rule, however, is subject to qualification. We have many times held that if the volume of water is substantially increased or if the manner or method of drainage is substantially changed and actual damage results, the servient owner is entitled to relief.

In Schwartz v. Wapello County, 208 Iowa 1229, 1230, 227 N.W. 91, 92, we said, "It has been the universal holding of this court that an easement exists for the drainage of the upper land,—the upper land being the dominant estate, and the lower land the servient estate,—and that the dominant owner may, by discharging the water upon his own land into a natural watercourse, drain surface water upon the land of the servient owner, but cannot gather larger quantities of water out of the ordinary and natural course of drainage and discharge the same upon the servient estate, to its substantial damage, in largely increased quantities, or at a different place or in a different manner than it would usually and ordinarily have gone in the natural course of drainage."

In Board of Supervisors of Pottawattamie County v. Board of Supervisors of Harrison County, 214 Iowa 655, 672, 241 N.W. 14, 20, 22, the general rule that the dominant estate may cast surface water upon the servient estate was again announced this way, "Therefore it seems that the rule under the statute now is that the upper proprietor may drain his land through natural watercourses in a way to increase the water that is to flow over the servient land, providing the increase is not too great or in such unnatural quantities 'as to be the cause of substantial injury.' * * * [I]t is important here to note that there is a limit to the manner and quantity in which water may be drained by the individual landowner from the dominant to the servient land. In addition to the foregoing, it is to be recognized that although to a certain extent a dominant landowner may increase the flow of the drainage water which falls to the servient land, yet he cannot drain such water 'in a different manner than the same would naturally and ordinarily have gone in the regular course of drainage', and thereby do substantial damage to the servient estate. * * * Consequently it appears that the individual landowner draining water on his own land cannot unusually increase the volume thereof onto the servient land, nor can he drain such water in an unusually or materially different way than the same naturally would run."

In Jacobson v. Camden, 236 Iowa 976, 977, 984, 20 N.W.2d 407, 408, we referred to section 4644.44, Code of 1939, now section 314.7, and stated, "it is the

duty of highway authorities to place openings in highway grades so as to permit surface water to escape in its natural course from the higher to the lower lands. And a servient landowner is not entitled to have the ditches along the highway so constructed and maintained as to fully protect his lands from surface water naturally flowing thereover, or to change the natural course of drainage. * * * Injunction will lie to restrain highway officials from so improving a highway as to divert water from its course of natural drainage and cause it to flow upon a plaintiff's land in an unusual and unnatural manner."

In Owens v. Fayette County, 241 Iowa 740, 744, 40 N.W.2d 602, 605, we sustained the right of the highway authorities to drain water so that it would escape in its natural course from higher to lower land but said, "However, in the improvement of the highways and the drainage of water from the dominant to the servient land it has been held that an injunction will lie to restrain highway officials from so improving a highway as to divert water from its natural course of drainage and cause it to flow upon appellee's land in an unusual and unnatural manner. * * *"

We have already quoted from Schmitt v. Kirkpatrick, supra, to the same effect.

In Woods v. Incorporated Town of State Centre, 249 Iowa 38, 45, 85 N.W.2d 519, 524, this court said, "It may be said then that when the municipality is engaged in lawful work, and acts prudently, on its own ground or streets, and it happens that from it some surface water is changed in its course and runs onto a lot not yet brought to grade in substantially increased quantity, it is not an actionable cause, but is damnum absque injuria. * * * If the amount is unreasonable or does actual damage, the rule would of course be otherwise. * * *"

The circumstances before us here fit the pattern of these cases. When, as here, defendant revamps the entire hillside; when it takes away all protective topsoil and vegetation; when it relocates the crown of the hill; when it installs numerous devices to discharge surface water at points which it has selected; when the course of drainage is altered *and* when all this causes immediate and repeated damage to plaintiffs' property, we must conclude defendant has failed to obey the statutory mandate not to "turn the natural drainage of surface waters to the injury of adjoining owners" and to "use strict diligence in draining the surface water from the public road in its natural channel."

■ Nothing we have said here conflicts with our previous pronouncements. As we observed in Johnson v. Iowa State Highway Commission, 250 Iowa 521, 527, 94 N.W.2d 773, 777, "This section [314.7] has not been construed strictly to the last drop of water but has been given a liberal construction which permits the improvement of streets and highways in harmony with the public interest. * * *"

We adhere to this principle but hold under the particular facts here the rights of plaintiffs cannot be ignored so that the public generally may benefit from a new and improved highway.

Perhaps we should say an additional word about the damages which justify an injunction in view of defendant's argument plaintiffs should in no event have this remedy.

■■ The rule is well stated in Schmitt v. Kirkpatrick, supra, 245 Iowa 971, 977, 63 N.W.2d 228, 231, as follows, "It is elementary that a court of equity will not resort to the granting of injunctive relief unless it appears there is an invasion or threatened invasion of a right, and that substantial injury will result to the party whose rights are so invaded, or such injury is reasonably to be apprehended. It is equally well settled that the burden is upon him who asks this relief to prove these elements of his case. We have announced and followed these rules in many drainage cases." See also Morrow v. Harrison

**538**

County, 245 Iowa 725, 731, 64 N.W.2d 52, 56 and citations.

From what we have already said it is apparent we believe plaintiffs come under the rule set out in the Schmitt case.

Defendant insists, however, that if plaintiffs have redress at all, it must be under chapter 25A, Code of Iowa, 1966, commonly referred to as the Tort Claims Act. We cannot agree.

■ We need not decide whether plaintiffs could bring an action under that chapter. We hold only that they were not required to do so.

Chapter 25A is limited to claims for money only by section 25A.2(5). Section 25A.16 makes the provisions of the Tort Claims Act the exclusive remedy in suits against the state, or one of its agencies, for money damages. The right to other relief, if it existed prior to the enactment of the State Tort Claims Act, still exists. An exhaustive discussion of the purpose and effect of this act appears in Graham v. Worthington, 259 Iowa 845, 146 N.W.2d 626. We hold chapter 25A does not abrogate the right, under proper circumstances, to injunctive relief against the highway commission.

We therefore hold against defendant on the claim that plaintiffs' action could only be brought under the Tort Claims Act.

■ In conclusion we mention briefly defendant's remaining assertion that we should not intervene to help plaintiffs because they were negligent in knowingly acquiring property at the base of a steep hill, where drainage problems should have been anticipated. Defendant urges plaintiffs should therefore bear the consequences of their folly. Under the circumstances shown here, we find no merit in this argument. We find that the plaintiffs have sustained their burden of proving defendant violated section 314.7 of the Code in constructing the highway heretofore described and that the doctrine of immunity relied on by defendant is therefore not applicable. We further hold plaintiffs have shown they have no adequate remedy at law and have established their right to an injunction to prevent further substantial damage to their property.

The trial court ordered defendant to remove ditch dikes at places identified in the record as No. 7 and No. 8. It also directed defendant to plug pipes running under the highway there with the additional provision that no water be permitted to drain through these two locations. The trial court found this would eliminate the cause of excessive drainage run-off and prevent further damage to plaintiffs' property.

We agree with these findings and the judgment is affirmed.

Affirmed.

All Justices concur.