# IN THE COURT OF APPEALS OF IOWA

No. 13-1498
Filed November 26, 2014

**A.D., L.L.C.,**
        Plaintiff-Appellee,

**vs.**

**2004 SC PARTNERS, L.L.C.,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey L. Poulson, Judge.

The owner of an apartment complex appeals from the district court's grant of equitable relief to the owner of adjoining property in this action involving the drainage of surface water from a dominant estate to a servient estate. **AFFIRMED.**

Joel D. Vos and Lance D. Ehmcke of Heidman Law Firm, L.L.P., Sioux City, for appellant.

Richard H. Moeller of Berenstein, Moore, Heffernan, Moeller & Johnson, L.L.P., Sioux City, for appellee.

Heard by Vogel, P.J., and Vaitheswaran and Potterfield, JJ.

**POTTERFIELD, J.**

2004 SC Partners, LLC (Partners)—the current owner of an apartment complex known as Morning Hills Apartments—appeals from the district court's grant of equitable relief to the owner of lower-lying adjoining property—A.D., L.L.C. (A.D.)—in this action involving drainage of surface water from a dominant estate to a servient estate. Partners argues the district court erred in (1) ruling it could be held liable for not abating an unreasonably dangerous condition on its property; (2) concluding A.D.'s claim was not barred by the statute of limitations; (3) awarding any recovery to A.D. despite finding it 65% at fault; and (4) granting equitable relief to A.D. without balancing the equities.[1] For the reasons that follow, we affirm.

**I. Background Facts and Proceedings.**

These adjoining property owners have been at odds since A.D. purchased its property in 2009. Partners filed a suit against A.D. in 2009, alleging A.D. was undermining Partners' hillside by grading A.D.'s lower property. However, the 2009 suit was dismissed because the neighbors had apparently reached a settlement agreement. Unfortunately, the settlement did not settle the issues between the property owners.

---

[1] Partners also contends the district court erred in denying its motion for summary judgment. We do not address this claim. *See Lindsay v. Cottingham & Butler Ins. Servs., Inc.*, 763 N.W.2d 568, 572 (Iowa 2009) ("The denial of a motion for summary judgment is no longer appealable once the matter proceeds to a trial on the merits. After a trial on the merits, the denial of the motion for summary judgment merges with the trial on the merits." (citation omitted)); *see also Estes v. Progressive Classic Ins. Co.*, 809 N.W.2d 111, 114 (Iowa 2012) ("When the district court denies a party's motion for summary judgment and the party appeals the final verdict, we review the issues raised in the unsuccessful motion for summary judgment based on the record made during trial and on the motion for directed verdict to determine if the district court committed error.").

Beginning in 2009, A.D. received notices from the city of Sioux City and the Iowa Department of Natural Resources (DNR) to abate a public nuisance, citing erosion and silting. The hillside between Partners' property and A.D.'s property is composed of highly-erodible loess soil, which continued to erode and cause silt buildup on and around A.D.'s acreage. Claiming it was not alone responsible for the problem, A.D. (the servient estate) filed this equity action in July 2011, in which it alleged,

> The improvements upon the defendant's [Partners'] real estate, including those relating to drainage, and defendant's [Partners'] operation of the real estate causes storm water to drain and discharge onto [A.D.'s] real estate in a manner, quantity, and rate that are not the natural and usual course of drainage and discharge, and otherwise not in compliance with applicable law.

A.D. asserted the drainage had caused and would continue to cause temporary and permanent damage to its property. A.D. sought both a money judgment for past damages, and a judgment and decree ordering Partners to abate the conditions that were causing the damage to A.D.'s property.

Partners answered and asserted several defenses. The first defense provided:

> The dispute raised by Plaintiffs Petition was previously addressed in an action filed in this Court on May 28, 2009, as Case No. EQCV-140187. The matter was resolved privately. Part of the resolution was that the Plaintiff would comply with local government requirements regarding the grading and lateral support issues and that the Plaintiff would take the action necessary to come into compliance regarding the Iowa Department of Natural Resources Notice of Violation issued to the Plaintiff on August 8, 2009 (copy attached as Exhibit 1), and in so doing would have resolved the grading/lateral support issue and the storm water flow issue without further damages or expense to the Defendant.

Partners also asserted: the damage claimed was a result of A.D.'s "own negligent and wrongful actions"; as the dominant estate, Partners had a drainage easement over A.D.'s servient estate; the petition failed to state a claim upon which relief could be granted; A.D.'s claims were barred by the statute of limitations; the negligence of others was a proximate or concurring cause of the damages; and A.D. had failed to mitigate its damages.

Partners filed a counterclaim, asserting A.D. had failed to comply with the settlement agreement between the parties and requesting the court order A.D. to "promptly stabilize the slopes" created by its excavation work, require A.D. to come into compliance with DNR requirements "and in so doing properly and adequately handle the surface water coming onto its property," and compensate Partners for damage to its land and as a result of the prior suit.

On March 9, 2012, Partners filed a motion for summary judgment in which it asserted it was the dominant estate and

> [b]ecause Plaintiff [A.D.] cannot produce evidence that 2004 SC Partners has engaged in conduct that substantially increased the natural flow of surface water from the dominant estate onto the servient estate, and that any such increase in the natural flow of surface water caused damages to the servient estate, there is no genuine issue of material fact to be tried by this case.

In support of its motion, Partners averred,

> 4. Surface water drains from the Morning Hills site owned by 2004 SC Partners onto the adjoining land owned by AD, LLC through high-density polyethylene (HDPE) drain piping.
> 5. The HDPE drainage system follows the natural flow of surface waters from the relatively higher parcel owned by 2004 SC Partners onto the relatively lower parcel owned by AD, LLC.
> 6. 2004 SC Partners has made no changes or alterations to the HDPE drainage system on the Morning Hills Property, either before or after AD, LLC acquired the adjoining real property.

7. The amount of surface water flowing through the HDPE drainage system has not increased or decreased due to any activity attributable to 2004 SC Partners.

8. The direction of surface water runoff has not changed in any manner as a result of the conduct of 2004 SC Partners.

(Citations omitted.)

A.D. resisted the motion for summary judgment, asserting it could establish that Partners' drainage system had changed the natural flow of water, and that Partners had allowed the system to fall into disrepair causing the "risk of complete failure and collapse." It argued Partners failed to exercise ordinary care by its "total failure . . . to maintain its drainage system at its termination point."

In ruling on the summary judgment motion, the district court noted the "general rule" that the dominant estate is entitled to drain surface water in a natural water course over the servient owner's land and, if any damage results, the servient owner is without remedy, subject to the qualification that "[i]f the volume of water is substantially increased or if the manner and method of drainage is substantially changed and actual damage results, the servient owner is entitled to relief." And citing *Oak Leaf Country Club v. Wilson*, 257 N.W.2d 739, 745-46 (Iowa 1977), the court also observed, "A corollary of the rule is an overriding requirement that one must exercise ordinary care in the use of his property so as to not injure the rights of neighboring landowners."

The court found,

The essential issue in this case is whether or not SC Partners is discharging water in an unnatural manner, has changed the method of drainage in such a way that it has become liable for damages, or, stated another way, whether it is exercising ordinary

care in the use of its property so as not to injure the rights of neighboring landowners.

It concluded there were questions of fact as to whether or not "Partners has violated a duty to use ordinary care in the maintenance of [its] property, and whether or not a private nuisance has been established." The district court therefore denied the motion for summary judgment.

Prior to the bench trial, the attorneys and the presiding judge viewed the property at issue.

At the May 2, 2013 trial, A.D.'s representative, Casey Fenton, testified A.D. obtained the property adjoining the west and south sides of Partners' property in February 2009, intending to develop the land. Partners' property was uphill from A.D.'s property. Fenton testified about Partners' drainage system. That system diverted about two-thirds of the storm water from the roofs and eaves of eight apartment buildings, as well as from the sidewalks and parking lot surrounding the apartments, towards the western side of Partners' property. The storm water so directed flows through two culverts and into and through an underground metal drain pipe, exiting into an "L" shaped concrete channel (spillway). The water then is directed toward a concrete bulkhead bordered by an earthen berm that is located near the western edge of Partners' property. At the bulkhead, water is expected to flow into two high density polyethylene (HDPE, i.e. plastic) pipes, which should carry the water underground and down the hill. However, A.D.'s exhibits show those pipes hanging off the concrete bulkhead in damaged condition, seemingly suspended in midair and not

connected to anything. The concrete bulkhead lies on Partners' property and about ten to fifteen feet from the western edge.

Fenton testified that under the bulkhead on Partners' property is a "void," which in his opinion was caused by "[c]ontinuous failure of maintenance." Partners' objected as "speculation" and the court sustained the objection due to lack of foundation. Fenton then testified the void was present in 2009 under the bulkhead and was caused when "soil collapsed underneath this and eroded away through multiple times of rains where the earth[en] berm had been slowly deteriorating away and water drained alongside the bulkhead, therefore collapsing the soil underneath." He testified the gap on the edge of the concrete bulkhead should have been filled and the failure to do so resulted in "uncontrollable water." Fenton testified he repeatedly had proposed connecting a pipe to Partners' drainage system so as to divert the storm water, but Partners' principal, Lew Weinberg, refused unless and until A.D. paid Partners' attorney fees from the 2009 litigation.

Fenton also testified that, in an effort to control the erosion from its side, in May through August 2011, A.D. had excavated its side of the property line, built a retaining pond to capture storm water below the bulkhead, and installed a piping system to direct the water further down the hill and into the city's storm water system. However, Fenton stated the storm water flowing around Partners' bulkhead had caused and continued to cause erosion away from A.D.'s system and water was finding its own way downhill, which was continuing to damage A.D.'s property.

Civil engineer Scott Gernhart testified he was contacted by Fenton in July 2009 to prepare an updated grading plan for A.D.'s property. He testified he saw the neighboring property bulkhead when he first viewed A.D.'s property and observed "[t]he soil under the concrete had eroded, and basically the slab was floating in air and supported on the sides, but there was definitely some soil missing." Gernhart also testified that the grading plan he prepared had a notation, "existing drainage condition not to be disturbed." He explained that was because "there had to be additional efforts to go onto the adjacent property" because "[t]he storm water coming from the apartment site—was such a great volume and intensity that there was no way to control that without tying into the storm water system and designing a system to carry it off the site."

Jon Sulzbach, president of Sioux City Engineering Company, testified he had been contacted by Fenton in the fall of 2010 to review the A.D. property to try to remedy erosion problems from the neighbors. Sulzbach stated he believed the "problem exists up on the apartment's site" and Fenton needed to "figure a way to get on the property to repair it." Sulzbach opined the "failure" started some thirty to forty feet behind the bulkhead in the concrete trough or channel leading to the bulkhead. He also testified the HDPE pipes were "not performing in whatever the design intent was of that structure."

Professional engineer Ryan Callaghan then testified about the increased runoff of surface water that results when land is developed with impervious materials. He testified he had viewed Partners' drainage system from the apartments and opined the concrete channel and headway (or bulkhead) were not being properly maintained. He testified the concrete structure and ditch walls

presented a "very unsafe, unstable condition." Callaghan stated the structure was not "letting the water out in what I would call a reasonable . . . standard of care from the apartment complex." He explained, "[T]here appear to be cracks both longitudinally and transverse which is allowing water to escape from the channel through the cracks underneath the structure," undermining the bulkhead and creating "a very unsafe, unstable condition." Callaghan also testified it was not possible for Partners' drainage system to work without there being a better connection between it and A.D.'s property. It was his opinion that the uphill owner should cooperate with A.D. to allow its water to safely enter A.D.'s system, and it was a lack of ordinary care not to do so.

Partners called civil engineer Chris Jens. Jens testified that the surface water flowing from Morning Hills apartment complex followed the "natural drainage out of the site." He agreed with Callaghan that the concrete bulkhead or headwall used was unusual, but stated it was an "acceptable method" for the time it was constructed (in the 1970s). He also agreed the end of Partners' drainage system was "pretty badly eroded." Jens testified, however, that the measures taken by A.D. in constructing a pool below the bulkhead impeded the flow of surface water and caused the void below the bulkhead, as well as additional erosion to A.D.'s property. On cross examination, Jens testified the bulkhead, or headwall as he referred to it, in its existing condition, was not functioning as originally intended because the headwall was "breached . . . on the one side," and there were cracks in the concrete channel. He agreed that for the structure to function as it was intended, the structure had to be maintained from time to time.

Lew Weinberg, the managing member of Partners, testified Partners had purchased the Morning Hills apartment complex in 2005 and had made "[n]o changes" to the drainage system since the purchase. Weinberg acknowledged Fenton had approached him to "address the water drainage off of our site that was going onto his property and was proposing that—the potential of buying a piece of our property in order to build a retention pond and to alleviate the drainage issue." Weinberg responded there was no interest in selling any of Partners' property. Weinberg testified that Fenton then proceeded to clear A.D.'s property of trees, which led to the previous 2009 lawsuit. He testified he believed that the breach to the side of the bulkhead was caused by "backhoe work that was going on by Fenton's crew when they were moving dirt in that area."[2]

Following the one-day bench trial, the district court concluded A.D.'s evidence was insufficient to allow it to succeed "on a claim based on increased volume of outflow or change in manner or method of outflow." However, the court concluded A.D.'s petition included sufficient facts to plead an alternative claim of negligence. The court found Partners had a duty to be aware of a dangerous condition on its property, i.e. the degraded drainage system that was causing injury to A.D.'s property, and failed to abate the condition after having a reasonable time to do so.

The trial court found A.D. had suffered damages in the amount of $92,800 as a result of Partners' failure to abate the problems with the drainage system. However, the court then found A.D. purchased the property knowing there was a

[2] Inasmuch as the bulkhead is part of Partners' drainage system and lies on Partners' property some ten to fifteen feet from A.D.'s property line, Weinberg's opinion is questionable.

problem with the neighboring drainage system, which was causing damage to the property, and that A.D. acted in a negligent manner inasmuch as it began work on the property without a specific plan to deal with the drainage issue and did not follow grading plans prepared by engineers. The court concluded A.D. was sixty-five percent and Partners was thirty-five percent at fault for the damage to A.D.'s property. Because A.D. was more than fifty percent at fault, under Iowa's Comparative Fault Act, it could not recover damages. However, the court found A.D. "can still receive equitable relief because the remaining affirmative defenses that [Partners] has raised do not insulate [Partners] from all liability."

The court rejected Partners' statute of limitations defense, finding the five-year statute of limitations applicable on a claim for damage to real property did not begin to run until 2009 "because A.D. could not have had actual or imputed knowledge of the damage until it inspected or purchased the property." Partners did not prove the damage to the property eventually purchased by A.D. occurred before the 2009 purchase. The court next found it could *not* conclude that something other than Partners' failure to abate the drainage system was the sole proximate cause of damage to A.D.'s property. The court also ruled that the easement a dominant estate has on a servient estate cannot provide a defense to a negligence claim. Finally, the court concluded Partners had failed to establish the parties had a prior settlement agreement, which nullified any defense based on an agreement.

The court wrote in summary:

> Based on the foregoing discussion, the Court finds that [Partners'] drainage system is damaging A.D.'s undeveloped lot, [Partners] knew that its drainage system was causing damage,

[Partners] knew that A.D. did not consent to the drainage system, and [Partners] has failed to correct the issue after having reasonable time to do so. This Court finds that [Partners] had a duty to abate the condition, and that it breached that duty. The Court also finds that A.D. failed to mitigate its damages when it did work without expert guidance and failed to follow a grading plan and that it should be held at fault for purchasing property with obvious damage. Accordingly, the Court finds that under Iowa's Comparative Fault Act, [Partners] is thirty-five percent at fault for the damage to the A.D. lot and A.D. is sixty-five percent at fault. Because A.D. is more than fifty percent at fault, it is barred from recovering damages. This Court orders [Partners] to take whatever action necessary to abate the condition that is damaging A.D.'s property and orders A.D. to allow such access to its property as is prudent and necessary for [Partners] to abate the condition.

Partners appeals, contending the district court erred in ruling it could be held liable for not abating a dangerous condition on its property. It notes that A.D.'s petition never pled or even described Partners' surface water drainage system as a "dangerous" condition and it contends the district court "went beyond its authority" in concluding A.D.'s petition gave rise to such a claim. Partners also argues the court erred in concluding A.D.'s claim was not barred by the statute of limitations, in awarding a recovery to A.D. despite finding it sixty-five percent at fault, and in granting equitable relief to A.D. without balancing the equities.

## II. Scope and Standards of Review.

"Because the proceeding in the district court was tried by equitable proceedings, our review of both the facts and the law is de novo." *Fairfax v. Oaks Dev. Co.*, 713 N.W.2d 704, 706 (Iowa 2006); *see also* Iowa R. App. P. 6.907 ("Review in equity cases shall be de novo."). We are not bound by the district court's fact-findings, but we give them weight, especially in deciding witness credibility. *City of Okoboji v. Okoboji Barz, Inc.*, 746 N.W.2d 56, 60 (Iowa

2008). We have a duty to examine the entire record and adjudicate anew the rights on the issues properly presented. *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).

**III. Discussion.**

*A. Liability.* Partners is offended by the trial court's finding that its drainage system was a dangerous condition, which was not asserted in A.D.'s pleadings. It attempts to confine A.D. to a suit based solely on damage caused by "an unnatural amount of water to be discharged on to A.D.'s land." It relies upon a defense that, in essence, it has done nothing to the drainage since purchasing the property and thus whatever flow there is the "natural flow" for which it has an easement as the dominant estate.

This line of argument is not supported by the course of the proceedings below. While we believe the district court's use of the term "dangerous condition" is somewhat confusing, Partners was given ample notice by the pleadings, the summary judgment ruling, and the evidence presented by A.D. that its drainage system was ineffective and unstable and its duty of ordinary care was at issue. The district court properly observed that "one must use ordinary care in the use of his property so as not to injure the rights of neighboring landowners." *Oak Leaf Country Club*, 257 N.W.2d at 745.

Partners, however, focuses solely on the "general rule"—that "the dominant estate is entitled to drain surface water in a natural water course from his land over the servient owner's land and, if any damage results, the servient owner is without remedy." *Rosendahl Levy v. Iowa State Hwy. Comm'n*, 171 N.W.2d 530, 536 (Iowa 1969); *see also Oak Leaf Country Club*, 257 N.W.2d at

745. Partners argues the evidence did not establish that the Partners had substantially increased or changed the manner or method of drainage and therefore A.D. was not entitled to relief. It complains that A.D.'s pleadings did not give it notice that any other claim was at issue.

We are not confined to Partners' characterization of A.D.'s pleading. The district court's ruling denying summary judgment emphasized:

> The essential issue in this case is whether or not SC Partners is discharging water in an unnatural manner, has changed the method of drainage in such a way that it has become liable for damages, or, stated another way, whether it is exercising ordinary care in the use of its property so as not to injure the rights of neighboring landowners.

The court denied Partners' summary judgment motion, concluding there remained questions of fact as to whether or not "Partners has violated a duty to use ordinary care in the maintenance of [its] property, and whether or not a private nuisance has been established."

In *Schropp v. Solzman*, 314 N.W.2d 413, 414 (Iowa 1982), the plaintiffs sued adjoining landowners for mud and water damage caused by the failure of the defendant's berms, which had been constructed to control the flow of surface water. The supreme court found that because the defendants knew that motorcycle traffic was damaging their property, the defendants were under a duty to the plaintiffs to take reasonable measures to inspect and maintain the artificial embankments and dikes. *Schropp*, 314 N.W.2d at 415. Because the berms were damaged, the defendants were liable for the damage caused when water and mud flowed onto the adjoining property. *Id.* The supreme court stated, "[T]he record supports the trial court's finding of a complete absence of corrective

measures or maintenance in an attempt to repair or alleviate the conditions." *Id.* at 416. Such is the case here and we find Partners' attempts to distinguish this case from *Schropp* unconvincing.[3]

All the engineer witnesses opined a landowner has a duty to maintain its drainage system. There was ample evidence Partners had knowledge its system was not functioning as it should. A picture (or two) can be worth a thousand words. This is the bulkhead at the end of Partners' drainage system as it appeared in July 2009:



The breach or gap between the concrete and berm described by the testifying engineers is visible above on the right side of the concrete bulkhead, as is the

---

[3] Partners' reliance on this court's opinion in *Newlin v. Callender*, No. 10-1014, 2011 WL 5460279 (Iowa Ct. App. Nov. 9, 2011), is also unpersuasive. The *Newlin* court stressed "no evidence was presented to prove that the Callenders had failed to maintain the pond, which prevented it from operating as intended." *Newlin*, 2011 WL 5460279, at *8.

severe erosion below the "floating" bulkhead.[4]  The cracks in the channel can be seen in the picture below.



Partners also had knowledge the underlying loess soil was highly erodible. It concededly has done "nothing" to the drainage system despite its knowledge that is drainage system was damaged and not working as intended.  In failing to maintain the drainage system, surface water was not channeled down the hill through the pipes of Partners' system, but had made its way through alternate routes, causing damage to A.D.'s property.  "[L]iability . . . exists if (1) the manner or method of drainage is substantially changed and (2) actual damage results." *O'Tool v. Hathaway*, 461 N.W.2d 161, 163 (Iowa 1990).  Here, the manner or method of drainage has substantially changed by Partners' failure to maintain its drainage system and because actual damage continues to result, "the servient

---

[4] Callaghan testified the condition was not safe and that he "would not have stood" in the position that the photographer must have to take this picture; "I've looked at it from above."

owner is entitled to relief." *See Oak Leaf Country Club*, 257 N.W.2d at 745; *see also Schropp*, 314 N.W.2d at 415.

**B. Statute of limitations.** Partners contends the district court erred in rejecting its statute of limitations defense because any cause of action accrued "decades" ago when the drainage system was constructed. But this contention is based upon the faulty premise that the cause of damage is a drainage system that is functioning as intended. The breach of ordinary care here is the defendant's failure to maintain or attempt to repair or alleviate the damaged drainage system after being informed by A.D. of the condition. *See Schropp*, 314 N.W.2d at 416.

The five-year limitations period begins to run upon accrual of the claim. *See* Iowa Code § 614.1(4) (2011) (providing five-year limitations period for "injuries to property"). "Generally, a claim accrues when the wrongful act produces injury to the claimant." *Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 230 (Iowa 2006) (citations and internal quotation marks omitted). Under the discovery rule, a cause of action based on negligence does not accrue until the plaintiff has discovered that it has suffered injury or by exercise of reasonable diligence should have discovered it. *Bob McKinness Excavating & Grading, Inc. v. Morton Bldgs. Inc.*, 507 N.W.2d 405, 408 (Iowa 1993). "The discovery rule tolls the statute of limitations until the plaintiff has discovered the fact of the injury and its cause." *Hallett Constr.*, 713 N.W.2d at 231 (citations and internal quotation marks omitted).

> Once a claimant learns information that would inform a reasonable person of the need to investigate, the claimant is on inquiry notice of all facts that would have been disclosed by a reasonably diligent

investigation. A claimant can be on inquiry notice without knowing the details of the evidence by which to prove the cause of action.

*Id.* (citations and internal quotation marks omitted).

While we agree with Partners that A.D. had notice there was surface water being discharged from the dominant estate when it purchased the lower lying property, as Partners acknowledges, the discovery rule is designed to mitigate the harsh results which might otherwise flow from strict adherence to the statute of limitations when an injured party is wholly unaware of the nature of its injury and the cause of the injury. *See Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 115-16 (Iowa 2008). Only after purchasing the adjoining property, did A.D. became aware that in order to alleviate excess erosion on A.D.'s property it needed to be able to tie into or alter the conditions on Partners' property. We conclude it was at this point A.D. knew of both the fact of injury and its cause. In any event, we do not believe the five-year statute of limitations bars A.D. of equitable relief from a continuing wrong, that is, Partners' failure to maintain and repair its faulty drainage system. *See Hegg v. Hawkeye Tri-County REC*, 512 N.W.2d 558, 559-60 (Iowa 1994).

***C. Comparative fault does not bar injunctive relief.*** Partners argues the Iowa Comparative Fault Act bars A.D. from any recovery. We reject its reading of the statute.

Iowa Code section 668.3 provides in part:

> (1)(a) Contributory fault shall not bar recovery in an *action by a claimant to recover damages* for fault resulting in . . . injury to . . . property unless the claimant bears a greater percentage of fault than the combined percentage of fault attributed to the defendants, third-party defendants and persons who have been released pursuant to section 668.7, but any damages allowed shall be

diminished in proportion to the amount of fault attributable to the claimant.

(Emphasis added.)

Partners argues—without citation to any authority—that more than fifty percent contributory negligence on the plaintiff's part bars any recovery, not just monetary damages. But the language of the provision does *not* state contributory negligence shall bar recovery. By its terms it applies "in an action by a claimant to *recover damages.*" Iowa Code § 668.3(1)(a) (emphasis added).

"In general, the purpose of section 668.3 is to make defendants pay in proportion to their fault." *Godbersen v. Miller*, 439 N.W.2d 206, 208 (Iowa 1989). "Under chapter 668, only a person found to be fifty percent or more at fault is jointly and severally liable for *economic damages.*" *Estes v. Progressive Classic Ins. Co.*, 809 N.W.2d 111, 115 (Iowa 2012) (emphasis added).

Comparative fault principles, however, do not reduce punitive damages because "[p]unishment, not compensation, is the goal" of punitive damages. *Id.* Similarly, the goal of injunctive relief is to avoid future harm, not to provide compensation. *See Jenkins v. Pedersen*, 212 N.W.2d 415, 420 (Iowa 1973) ("Injunction is primarily a preventive remedy and looks to the future rather than to the past and is not used to punish wrongful acts already committed."). We are not convinced A.D. is barred from equitable relief by its contributory negligence.

***D. Availability of equitable relief.*** "An injunction may be obtained as an independent remedy by an action in equity, or as an auxiliary remedy in any action." Iowa R. Civ. P. 1.1501. "In order to obtain an injunction, a party must show '(1) an invasion or threatened invasion of a right, (2) substantial injury or

damages *will result* unless an injunction is granted, and (3) no adequate legal remedy is available.'" *In re Estate of Hurt*, 681 N.W.2d 591, 595 (Iowa 2004) (emphasis added) (citation omitted)). We exercise our discretion when determining whether to issue an injunction based on traditional principles of equity applied to the specific circumstances of a case. *Nichols v. City of Evansdale,* 687 N.W.2d 562, 572 (Iowa 2004). The following factors aid in our determination:

> "(a) the nature of the interest to be protected,
> (b) the relative adequacy to the plaintiff of injunction and of other remedies,
> (c) any unreasonable delay by the plaintiff in bringing suit,
> (d) any related misconduct on the part of the plaintiff,
> (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,
> (f) the interests of third persons and of the public, and
> (g) the practicability of framing and enforcing the order or judgment."

*Id.* (quoting Restatement (Second) of Torts § 936(1)).

A consideration of the relevant factors weighs in favor of an injunction. Partners contends it has the right to drain its storm water over the servient estate. But it ignores its duty of ordinary care to use of its property so as not to injure the rights of neighboring landowners, as well as its duty to maintain its drainage system. Nor does A.D. have an adequate remedy at law for future damage to its property if Partners is not required to abate the condition. Although money damages were available to A.D. for past damage, future harm can be remedied only by injunctive relief. Partners has no right to continue in its complete failure to attend to the known and obvious failings in its own drainage

system, which sits in highly erodible soil. An order to abate its continuing negligence is not beyond the scope of the court's authority.

We do not find A.D. unreasonably delayed in bringing suit or otherwise came to the court with unclean hands. And an injunction is the only remedy that will bring an end to Partners' continuing failure to attend to its duty to maintain and repair its drainage system.[5] Moreover, we conclude the public has an interest in these two property owners curbing continuing erosion and run off on to the roadway adjacent to A.D.'s property.

We therefore enjoin Partners from continuing to allow its drainage system to function without repair and order it to take whatever action is necessary to ensure that its drainage system is properly functioning at its own cost.

We further order Partners to allow A.D. such access to Partners' property, if required, to tie into a properly functioning drainage system, which will allow storm water to safely traverse A.D.'s property.

**AFFIRMED.**

---

[5] A.D. has not cross-appealed the finding that it is barred from recovering monetary damages.